Eric Liepins
Texas Bar No. 12338110
LAW OFFICE OF ERIC A. LIEPINS, P.C.
12770 Coit Road, Suite 850
Dallas, Texas 75251
(972) 991-5591 telephone
(972) 991-5788 facsimile
Email: Eric@ealpc.com

PJ Putnam
Texas Bar No. 24041734
LAW OFFICE OF PJ PUTNAM, PC
18208 Preston Road, Ste. D9-159
Dallas, Texas 75252
(214) 449-0566 (Telephone)
Email: pjputnam@TexasBizLawyer.com

ATTORNEYS FOR INDEPENDENCE FUEL SYSTEMS, LLC

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: § § | | CHAPTER 11 |
| RICHARD KEVIN RUSSELL, § § | | CASE NO. 22-41793-MXM11 |
| Debtor. § § | | |
| § § | | |
| INDEPENDENCE FUEL SYSTEMS, LLC, § § § | | |
| Plaintiff, § § | | ADVERSARY NO. _____ |
| v. § § | | |
| RICHARD KEVIN RUSSELL § § | | |
| Defendant. § § | | |

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
## PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A), (4), & (6)

Plaintiff Independence Fuel Systems, LLC (the, "Plaintiff" or "IFS") files this Complaint (the "Complaint") to Determine Dischargeability of Debt Pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") against Defendant Richard Kevin Russell ("Defendant" or "Russell") and would respectfully show the Court as follows:

## I. INTRODUCTION

1. Russell knows how to use his charisma to run a room as a pool shark runs a pool table. For the past eleven years or so, Russell and his family (who report solely to him) controlled all aspects of the Plaintiff. During that time, Russell used the Plaintiff's bank accounts as his own "piggy bank," taking money for his personal expenses and other financial whims. Further, Russell failed to keep the Plaintiff's Board of Managers and the Plaintiff's Members knowledgeable regarding material transactions that directly impacted their ownership. And, after Russell ran the Plaintiff into the ground by running off current and potential customers and failing to repay in any meaningful fashion the original loan from Origin Bank and the second, unsanctioned loan, from Origin Bank, with the Plaintiff two weeks from going into a forced receivership, he left the company to fend for itself. However, Russell's departure was not complete before he removed the remaining funds left in the Plaintiffs now-bankrupt accounts. Approximately one month after the Plaintiff was forced into its bankruptcy, Russell filed his own bankruptcy in an attempt to shield himself from the claims the Plaintiff and others could possibly bring against him. This bankruptcy is a direct and unmitigated effort to hide the wrongful things that Russell did to the Plaintiff and its Members. Russell's attempted shield in the form of his bankruptcy is clearly an attempt to avoid repaying the debt he fraudulently acquired from the Plaintiff. Russell's attempted shield by bankruptcy must fail since the debt Russell owes to the Plaintiff is nondischargeable under Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6).

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the District Court's Miscellaneous Order No. 33, Order of Reference of Bankruptcy Cases and Proceedings *Nunc Pro Tunc*, dated August 3, 1984. This is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this district is proper pursuant to 28 U.S.C. § 1409. The statutory predicate for the relief requested herein is pursuant to Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6).

3. Plaintiffs hereby consent to this Court's entry of final orders and judgment in connection with this Adversary Proceeding.

### III. PARTIES

4. Plaintiff Independence Fuel Systems, LLC, is a limited liability company organized under the laws of Texas, with its primary operations conducted from Dallas County.

5. Defendant, Richard Kevin Russell is an individual who resides in Tarrant County, Texas, and may be served at the address shown on his bankruptcy petition, 4767 Overton Woods Drive, Fort Worth, Texas 76109. With a copy to his counsel of record, Stephanie Curtis, 901 Main Street, Suite 6515, Dallas, Texas 75202.

### IV. RELEVANT FACTUAL BACKGROUND

6. From December 2011 to June 2022, Russell was the Chief Operating Officer and Chairman of Plaintiff, a CNG provider.

7. Russell, as the leader of the Plaintiff, told the members that IFS would be a company without employees – the people who actually worked to build and maintain the six CNG stations were independent contractors paid and received annually an IFS Form 1099.

8. The IFS Company Agreement stated there would be no employment contracts in any amount without the direct written authorization from the IFS Board of Managers. Prior to its entering into its own bankruptcy proceedings in July 2022, the IFS Board of Managers had not authorized anyone to be an employee and, consequently, no one was authorized to be paid a salary.

9. In 2013, Russell was personally sued by Rory Didas with Ike Energy LLC for violating his personal non-disclosure agreement; that suit was settled with Russell paying $150,000.00 of which he simply took from Plaintiff's bank account without approval or even notice to the Plaintiff's Members or other managers on the Plaintiff's Board of Managers.

10. From 2013 through 2016, Russell led the dilution of Plaintiff's Founding Members membership interests' multiple times with such actions leading to the "new" membership interests being sold to 3rd parties without noticing nor compensating the original Founding Members for their membership percentage loss.

11. In direct contravention of the Plaintiff's Company Agreement, which states that Members were precluded from selling or transferring their membership interests without the Board of Managers express approval, Russell sold his shares (and the shares of his family members) to 3rd parties for personal gain.

12. Further to the unsanctioned transferring of personal shares, Russell transferred the remaining portion of his personal ownership in the Plaintiff to a different company that he owns, Toledo Gas Gathering LLC, without the Plaintiff's Board of Managers' knowledge or approval.

13. As the Plaintiff's Chief Operating Officer and Chairman of the Board of Managers, Russell failed to provide oversight to the Plaintiff's financial officer who negligently incurred $4,132 in non-sufficient funds fees and $1,855 wire fees when such costs could have been avoided.

14. When Russell stated that Plaintiff needed additional capital funds, Russell requested and received approval for a $3,500,000 loan from the Plaintiff's Board of Managers and Plaintiff's Members.

15. Russell knowingly used financial statements that he directly inflated or had someone under him inflate in order to make Plaintiff's revenues more attractive to potential loan partners.

16. Armed with the authority to enter into a $3,500,000 loan and the cooked books, Russell contacted Origin Bank, who entered into a loan agreement with Plaintiff on July 26, 2016.

17. The Loan Agreement was limited and specified the activities for which IFS could seek advances. Specifically, the Loan Agreement provided: "Advances on the Advance Loan may be used only for the following purposes: (i) to refinance existing debt owed by Borrower to Austin Bank, Texas N.A., (ii) to accounts payable owed by Borrower, and (iii) for capital expenditures and working capital related to the new fueling station in Laredo, Webb County, Texas." *See* Loan Agreement §1(c).

18. The Loan Agreement also detailed the collateral IFS had to provide to secure the loan including, but not limited to, "an Assignment of Deposit Account (the "<u>Assignment of Deposits</u>") of even date, executed by Borrower in favor of Lender, and covering a certificate of deposit maintained at Lender with a minimum amount of $500,000.00." *See* Loan Agreement §2(a)(v). To secure this collateral as outlined in the Loan Agreement, Origin was required to file the appropriate U.C.C documents. Although Origin filed these documents, they lapsed on their own terms in or about 2020. Upon the lapse of the U.C.C. documents, Origin lost its secured status. Origin attempted to rectify this lapse, approximately two months later, by refiling identical U.C.C. documents to secure the loan without providing IFS additional consideration.

19. The Loan Agreement was limited and specified the activities for which IFS could seek advances. Specifically, the Loan Agreement provided: "Advances on the Advance Loan may be used only for the following purposes: (i) to refinance existing debt owed by Borrower to Austin

Bank, Texas N.A., (ii) to accounts payable owed by Borrower, and (iii) for capital expenditures and working capital related to the new fueling station in Laredo, Webb County, Texas."

20.     The Loan Agreement also detailed the collateral IFS had to provide to secure the loan including, but not limited to, "an Assignment of Deposit Account (the "Assignment of Deposits") of even date, executed by Borrower in favor of Lender, and covering a certificate of deposit maintained at Lender with a minimum amount of $500,000.00."

21.     Subsequently, on July 25, 2017, Russell, on behalf of IFS, and Hamilton, on behalf of Origin, entered into a First Amendment to Loan Agreement ("Amended Loan Agreement"). The Amended Loan Agreement provided a Second Advance Loan "in the maximum principal amount of $1,500,000.00." Like the Loan Agreement, the Amended Loan Agreement specifically provided that IFS could use advanced loan proceeds only for the following purposes: (i) to refinance existing debt owed by Borrower to Austin Bank, Texas N.A., (ii) to accounts payable owed by Borrower, and (iii) for capital expenditures and working capital related to the new fueling station in Laredo, Webb County, Texas. *See* Amended Loan Agreement §1(d). Additionally, the Amended Loam Agreement required as a condition precedent, "a written consent in Proper Form signed by the holders of 80% of Borrower's membership interest consenting to the Second Advance Loan." *See* Amended Loan Agreement §3(d). Importantly, with respect to the Loan Agreement and the Amended Loan Agreement, IFS never had any debt with Austin Bank, Texas N.A. To the contrary, any debt owed to Austin Bank, Texas N.A. was held by an entity that was owned and controlled by Russell.

22.     Shockingly, Russell did not notify the Plaintiff Board of Managers nor the Plaintiff Members that he was interested in obtaining a second loan from Origin Bank in the amount of $1,500,000.

23. Plaintiff did not know about the additional loan and, therefore could not consent to the Amended Loan Agreement; and, which means that Plaintiff did not satisfy all conditions precedent to enter into the Amended Loan Agreement.

24. Although the loan officer, Curtis Hamilton ("Hamilton") at Origin Bank, who was in a friendly relationship with Russell, was aware of the contractual obligation that 80% of IFS's membership interest had to consent to the Loan Agreement and Amended Loan Agreement, he, nevertheless provided the Advance Loans to Plaintiff without Plaintiff's consent and, instead, relied on his personal relationship with Russell in extending unauthorized loans.

25. Once Russell entered into these loan agreements with Origin, Hamilton allowed Russell to use the funds as his personal piggy bank. Specifically, on August 3, 2017, Hamilton authorized Russell's first draw request on the Amended Loan Agreement in the amount of $636,977.98 without following the proper procedures as prescribed by the Amended Loan Agreement. Specifically, the Loan Agreement and Amended Loan Agreement provided, "Borrower shall give notice to Lender of the requested advance on the Revolving Loan, in the form of the Request for Borrowing attached as Exhibit B, not later than 10:00 a.m. (Fort Worth, Texas time) on the date of the requested advance." Russell requested the first draw via email and Hamilton authorized this draw without first receiving proper documentation including receipts establishing the propriety of the expenses. Shockingly, Hamilton authorized a payment of $101,320.21 to Eastman Midstream, a company Hamilton knew was owned, controlled, and operated by Russell.

26. Not only did Hamilton authorize the above-referenced payment to Russell's company, Hamilton released the certificate of deposit that IFS put forth to secure the Loan Agreement to Russell on May 18, 2018. Although Hamilton authorized the release of the certificate

of deposit into IFS' account with Origin, he authorized the release to Russell who made the request on behalf of Toledo Gas Gather, LLC—another company owned, controlled, and operated by Russell. Further, Hamilton authorized this release into an account that listed only Russell as a signatory. Once the funds were released, Russell closed the account and absconded with the funds. Hamilton released these funds to Russell with no approval from IFS.

27. Hamilton—and therefore Origin—always knew Russell lacked authority to apply for the above-referenced loans and IFS failed to satisfy all conditions precedent to the agreements. Further, Origin unconscionably released funds to Russell's companies and allowed him to defraud IFS by releasing the certificate of deposit directly to Russell. Origin engaged in these activities without regard to the duties it owed its borrower, IFS. Upon information and belief, Hamilton and Russell worked together to defraud IFS for their personal benefit.

28. The fact that Russell and Hamilton worked together to defraud IFS is illuminated further by the fact that Hamilton inexplicably approved an <u>unsecured personal loan</u> in the amount of $300,000.00 to Russell.

29. For approximately two years, Russell directed Plaintiff's financial officers to make loan payments to Origin Bank according to the Loan Agreement and the Amended Loan Agreement.

30. Unbeknownst to anyone (other than Russell or his family) at Plaintiff, in or around 2018, Russell stopped making payments on either loan to Origin Bank.

31. In 2019, Origin Bank sued Plaintiff under the Loan Agreement and the Amended Loan Agreement. Russell failed to notify the Plaintiff Board of Managers and the Plaintiff Members of such lawsuit.

32. Although Plaintiff had a general counsel, Russell hired a personal friend to be defend against the Origin Bank lawsuit.

33. At some point during the lawsuit, Origin Bank moved for summary judgment against the Plaintiff – neither Russell nor his attorney friend responded to Origin Bank's motion for summary judgement and summary judgement was awarded to Origin Bank.

34. Origin Bank filed for a receivership and Plaintiff received a court-appointed attorney, Larry Fowler, for its defense.

35. Russell entered into negotiations with Origin Bank to avoid receivership – Origin Bank demanded an immediate payment of $150,000 from Plaintiff. Russell wrote a check for $150,000 to Origin Bank and that check was returned non-sufficient funds. So, Russell returned to the negotiating table with Origin Bank by bringing a second check. Immediately prior to handing the second check in the amount of $150,000 to Origin Bank, he contacted the check's bank and stopped payment on that check! All the while, Russell used this subterfuge to entice Origin Bank to sign a settlement, which would remove Russell and his brother-in-law as guarantors to the two loans while leaving one sole, non-family member, as the only remaining guarantor.

36. When the second check that Russell presented Origin Bank did not clear, Origin Bank "tore up" the settlement agreement and moved forward with the goal of putting Plaintiff in a receivership position.

37. While all of the legal actions were going one, Russell – as the Chief Executive Officer and Chairman of the Board of Managers – was able to keep all information relating to the loans and the lawsuit from the other members of the Plaintiff Board of Managers and the Plaintiff Members.

38. In the first week of April 2022, Longview Station (131 Pittman Road, Longview, TX) stopped selling CNG – this stoppage was relayed to Plaintiff by Russell who stated that gas stoppage was directly caused by the compressor rented by Russell's company, Eastman Midstream, LP, failing. Russell blamed lack of parts, the rental company, and even the lack of supply chain for such delay in bringing the gas back to the station. Russell used this opportunity to authorize a payment in the amount of $41,400 to Eastman Midstream, LP (QuickBooks entry: "Eastman Compressor per RKR on 5/16/22").

39. However, research into the reason why the compressor failed put a new light on the situation – the compressor owned by the rental company had NOT failed. The rental company simply turned the compressor off because Russell's company, Eastman Midstream, LP, had not used the payments made by the Plaintiff to purchase gas from Eastman Midstream, LP to pay its fees! With months of non-payment, the compressor rental company removed the compressor. Once Russell realized that his charade of maintenance/mechanical issues no longer were valid, he made arrangements for another – albeit smaller and cheaper – compressor to be installed so that Longview could return to selling CNG. However, Longview Station had been without gas for almost three months. This lack of supply dried up its steady customer base, who sought CNG elsewhere. The lack of customers crippled this once vibrant CNG station!

40. In the third week of June 2022, with the writing on the wall that Origin Bank was going to be granted the receivership over IFS; and, IFS's assets were to be sold, Russell resigned his position as the IFS' Chief Executive Officer and its Chairman of the Board of Managers – he resigned without telling anyone at IFS about the legal mess they were in, nothing about the impending receivership, and nothing about the unpaid loans that he originated with Origin Bank.

41. However, Russell didn't resign from IFS empty-handed, before and after he left IFS he directed his brother, Raymond Russell, to further drain the IFS coffers. An example of this siphoning includes (but, is not limited to) Russell authorizing an IFS payment to CSI CompressCo in the amount of $23,000 (QuickBooks entry is: "7/1/22 paid to CSI Compressco $23,000 – IFS Paid Compressor Rental") – this rental is for a compressor that is used exclusively Eastman Gas Gathering, LLC, a company owned by Russell. Austin Bank records concur with this payment.

42. During the first week of July 2022 and with less than two weeks before Origin Bank's, would be, final hearing before it received the IFS receivership, Larry Fowler resigned as counsel because Russell's payments checks bounced and Mr. Fowler had not been paid for his work.

43. During Russell's tenure as the IFS's Chief Executive Officer, he authorized all of the state and federal tax filings – during that entire time, IFS did not declare a profit to the taxing authorities all of which conflicts with the documentation that Russell used in other ways.

44. Further, Russell failed in his oversight of the tax filings – numerous quarters and even years of filing requirements for excise taxes were neglected. Such neglect is unconscionable because he knew that by accurately and timely following the excise tax requirements, IFS would have been entitled to a financial boon in the form of returned dollars from the "Alternative Fuel Tax Credit."

45. Additionally, Russell concealed that he and his brother, the IFS's Chief Financial Officer, were neglecting to maintain accurate records regarding Plaintiffs' accounting information and Russell tried to conceal his substantial use of the Plaintiff's bank accounts for his personal and illegal use. Exhibit A shows that Russell transferred, withdrew, or removed personally or asked

his brother, the IFS's Chief Financial Officer, to withdraw, transfer, or remove funds from the Plaintiff in the total amount of $583,597.79!

46. During Russell's 314 Creditor's Meeting, under oath, Russell stated numerous times that he did not take a salary from IFS and that he was not entitled to take a salary from IFS – yet, the IFS' Quickbooks maintained by his brother, Raymond (IFS CFO) state it differently. See Attachment A.

47. Russell's flagrant use of the IFS' banking accounts as his personnel piggy bank from which he paid his personal expenses was so severe that a creditor could accurately make the claim that IFS was an alter-ego of Russell; and, therefore the corporate veil afforded by being a limited liability company could easily have been pierced, leaving all IFS managers at personal risk – all due to a combination of Russell's gross negligence and outright intent to hurt IFS.

48. Russell colluded with Raymond Russell (IFS CFO) to transfer ownership of the pipelines originally owned by IFS to another entity owned by Russell and his brother! Such transfer was done without the knowledge or approval of the Plaintiff Board of Mangers nor the Plaintiff Members. In fact, this transfer was such a secret kept by Russell and his family that no one at IFS knew about such transfer until the summer of 2022.

49. Russell knew Plaintiffs were unaware of Russell's misappropriation and misuse of corporate funds and that Plaintiffs did not have an equal opportunity to discover the truth about such information.

50. As the CEO and Chairman of the Board of Managers, Russell had superior knowledge regarding the company's funds, knowledge which he knew Plaintiffs could not have learned except through Russell's disclosure.

51.     Russell deliberately remained silent and did not disclose any information to Plaintiffs – he stopped all annual Members Meetings and Board of Managers Meetings with the last meeting held in 2017!

52.     Plaintiffs, relying on Russell's misrepresentations, suffered extensive damages and direct loss of funds.

53.     As further details about the company's missing funds emerged, Plaintiffs began to learn they had been deceived and defrauded and are hereby asking for the company's money back.

54.     On August 4, 2022, Russell filed for relief under Chapter 11 of the Bankruptcy Code, Case No. 22-41753-ELM11, which was dismissed for failure to file a required form 121.

55.     Shortly thereafter, on August 8, 2022, filed a second bankruptcy case under Chapter 11 of the Bankruptcy Code, which is currently pending before this Court.

### V.     CAUSES OF ACTION

**A.     Count 1 – Objection to Dischargeability Pursuant to Section 523(a)(2)(A) of the Bankruptcy Code**

56.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully stated herein.

57.     Under section 523(a)(2)(A) of the Bankruptcy Code:

> A discharge under section [1141] . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of     credit, to the extent obtained by . . . false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

58.     As specifically alleged in the Original Petition and as is reflected in the Agreed Final Judgment and Final Judgment, Russell committed fraud by perpetuating a fraudulent scheme by which he obtained and misappropriated money from Plaintiffs.

59. The debt owed by Russell, as evidenced by the Final Judgment, was obtained by false pretenses, false representations, and/or actual fraud.

60. Therefore, the debt owed to Plaintiffs by Russell is non-dischargeable, as it is a debt for money, property, services, or an extension, renewal, or refinancing of credit, that was obtained by false pretenses, a false representation, or actual fraud within the meaning of Bankruptcy Code § 523(a)(2)(A). Plaintiffs therefore request a determination by this Court that the debt is non-dischargeable by Russell.

**B. Count 2 – Objection to Dischargeability Pursuant to Section 523(a)(2)(B) of the Bankruptcy Code**

61. Plaintiffs repeat and reallege each of the allegations set forth above as if fully stated herein.

62. Pursuant to Section 523(a)(2)(B) of the Bankruptcy Code:

A discharge under section [1141] . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . use of a statement in writing[:] (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2)(B).

63. As specifically alleged in the Original Petition and as is reflected in the Agreed Final Judgment and Final Judgment made or published false statements to obtain money, property and/or services from Plaintiffs.

64. The false statements made or published by Russell to Plaintiffs were: (1) materially false; (2) respecting Russell's and Toledo's financial condition; (3) which Russell reasonably relied upon; and (4) made or published by Russell with the intent to deceive Plaintiffs.

65. Therefore, the debt owed to Plaintiffs by Russell should be excepted from discharge pursuant to Section 523(a)(2)(B) of the Bankruptcy Code.

C. **Count 3 – Objection to Dischargeability Pursuant to Section 523(a)(4) of the Bankruptcy Code**

66. Plaintiffs repeat and reallege each of the allegations set forth above as if fully stated herein.

67. Section 523(a)(4) provides an exception from discharge of a debt <u>arising from fraud or defalcation by one acting in a fiduciary capacity, or of a debt arising from **embezzlement** or larceny</u>.

68. Pursuant to Section 523(a)(4) of the Bankruptcy Code:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt ... (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . .11 U.S.C. § 523(a)(4).

69. As set forth above, Defendant's actions in taking unauthorized monies from the Plaintiff amount to embezzlement from the Plaintiff.

70. As set forth above Defendant's action in violation of his corporate duties among to breaches of his fiduciary duty to the Plaintiff.

71. Therefore, the debt to Plaintiffs by Defendant should be exempted from discharge pursuant to Section 523(a)(4) of the Bankruptcy Code.

D. **Count 4 – Objection to Dischargeability Pursuant to Section 523(a)(6) of the Bankruptcy Code**

72. Plaintiff repeat and reallege each of the allegations set forth above as if fully stated herein

73. At the time Defendant falsely represented the above facts to Plaintiff, ne had no intention on telling Plaintiff the actual truth about the funds and the use of funds detailed above.

74. Defendant's action in concealing the true nature and use of Plaintiff's funds as set forth above was done willfully and maliciously to cause injury to the Plaintiff.

75. Therefore, the debt by Defendant to Plaintiff should be exempted from discharge under Section 523(a)(6) of the Bankruptcy Code.

**Count 5 – Attorney's Fees and Costs**

76. Plaintiffs repeat and reallege each of the allegations set forth above as if fully stated herein.

77. To the extent Plaintiffs are entitled to attorney's fees and costs under applicable law, Plaintiffs request recovery of such fees and costs in connection with the prosecution of this Adversary Proceeding.

### VI.   REQUEST FOR RELIEF

WHEREFORE, premises considered, Plaintiff Independence Fuel Systems, LLC, respectfully requests that this Court enter an order (1) determining that the debt owed by Defendant Richard Kevin Russell to the Plaintiff is non-dischargeable under 523(a)(2)(A), 523(a)(4), and 523(a)(6); (2) allowing recovery of Plaintiff's reasonable costs and attorney's fees incurred in connection with this Adversary Proceeding; and (3) for such other and further relief as Plaintiffs may show themselves to be justly entitled in law or in equity.

Respectfully submitted,

By:     */s/ PJ Putnam*
       PJ Putnam
       Texas Bar No. 24041734
       LAW OFFICE OF PJ PUTNAM, PC
       18208 Preston Road, Ste. D9-159
       Dallas, Texas 75252
       (214) 449-0566 (Telephone)
       Email: pjputnam@TexasBizLawyer.com

       Eric Liepins
       Texas Bar No. XXXXXXXXX
       LAW OFFICE OF ERIC A. LIEPINS, P.C.
       12770 Coit Road, Suite 850
       Dallas, Texas 75251
       (972) 991-5591 telephone
       (972) 991-5788 facsimile
       Email: Eric@ealpc.com

       **ATTORNEYS FOR PLAINTIFF**

Exhibit A

**Independence Fuel Systems, LLC**

| Date | Type | No. | Payee | Category | Total |
|---|---|---|---|---|---|
| **Bill Payments** | | | | | |
| 08/06/2020 | Check | debit | R. Kevin Russell | Due To/From Kevin Russell | $ 15,000.00 |
| 08/05/2020 | Check | debit | R. Kevin Russell | Due To/From Kevin Russell | $ 15,000.00 |
| 08/04/2020 | Check | debit | R. Kevin Russell | Due To/From Kevin Russell | $ 50,500.00 |
| 07/17/2020 | Check | debit | R. Kevin Russell | Due To/From Kevin Russell | $ 7,000.00 |
| 03/13/2020 | Check | debit | R. Kevin Russell | Due To/From Kevin Russell | $ 47,000.00 |
| 11/19/2019 | Check | debit | R. Kevin Russell | Ask My Accountant | $ 47,000.00 |
| 10/03/2019 | Check | debit | R. Kevin Russell | Ask My Accountant | $ 1,700.00 |
| 10/03/2019 | Check | debit | R. Kevin Russell | Ask My Accountant | $ 25,000.00 |
| 09/09/2019 | Check | debit | R. Kevin Russell | Ask My Accountant | $ 5,000.00 |
| 08/19/2019 | Check | debit | R. Kevin Russell | Ask My Accountant | $ 10,000.00 |
| 08/16/2019 | Check | debit | R. Kevin Russell | Ask My Accountant | $ 25,000.00 |
| 08/01/2019 | Check | debit | R. Kevin Russell | Ask My Accountant | $ 30,000.00 |
| 07/31/2019 | Check | debit | R. Kevin Russell | Ask My Accountant | $ 79,000.00 |
| 07/30/2019 | Check | debit | R. Kevin Russell | Ask My Accountant | $ 35,000.00 |
| 07/18/2019 | Check | debit | R. Kevin Russell | Ask My Accountant | $ 40,000.00 |
| 07/10/2019 | Check | debit | R. Kevin Russell | Ask My Accountant | $ 15,000.00 |
| 07/22/2014 | Check | 1395 | R. Kevin Russell | Ask My Accountant | $ 30,000.00 |
| | | | | **Total Bill Payments** | **$ 477,200.00** |
| **Checks** | | | | | |
| 01/29/2021 | Bill Payment (Check) | 3586 | R. Kevin Russell | Due To/From Kevin Russell | $ 975.00 |
| 10/15/2020 | Bill Payment (Check) | 3444 | R. Kevin Russell | Due To/From Kevin Russell | $ 6,826.51 |
| 09/29/2020 | Bill Payment (Check) | 3411 | R. Kevin Russell | Due To/From Kevin Russell | $ 2,086.54 |
| 05/19/2020 | Bill Payment (Check) | debit | R. Kevin Russell | Due To/From Kevin Russell | $ 20,000.00 |
| 02/18/2020 | Bill Payment (Check) | debit | R. Kevin Russell | Due To/From Kevin Russell | $ 17,000.00 |
| 02/14/2020 | Bill Payment (Check) | debit | R. Kevin Russell | Due To/From Kevin Russell | $ 16,913.47 |
| 02/14/2020 | Bill Payment (Check) | 3164 | R. Kevin Russell | Due To/From Kevin Russell | - |
| 02/11/2016 | Bill Payment (Check) | 2300 | R. Kevin Russell | Due To/From Kevin Russell | $ 96.35 |
| 08/19/2015 | Bill Payment (Check) | 2003 | R. Kevin Russell | Due To/From Kevin Russell | $ 7,083.32 |
| 06/02/2015 | Bill Payment (Check) | 1919 | R. Kevin Russell | Due To/From Kevin Russell | $ 8,854.15 |
| 10/31/2014 | Bill Payment (Check) | 1586 | R. Kevin Russell | Due To/From Kevin Russell | $ 10,624.98 |
| 07/31/2014 | Bill Payment (Check) | 1441 | R. Kevin Russell | Due To/From Kevin Russell | $ 1,770.83 |
| 07/23/2014 | Bill Payment (Check) | 1413 | R. Kevin Russell | Due To/From Kevin Russell | $ 1,770.83 |
| 06/25/2014 | Bill Payment (Check) | 1363 | R. Kevin Russell | Due To/From Kevin Russell | $ 1,770.83 |
| 05/30/2014 | Bill Payment (Check) | 1325 | R. Kevin Russell | Due To/From Kevin Russell | $ 3,541.66 |
| 05/08/2014 | Bill Payment (Check) | 1293 | R. Kevin Russell | Due To/From Kevin Russell | $ 1,770.83 |
| 02/15/2014 | Bill Payment (Check) | 1213 | R. Kevin Russell | Due To/From Kevin Russell | $ 1,770.83 |
| 01/14/2014 | Bill Payment (Check) | 1192 | R. Kevin Russell | Due To/From Kevin Russell | $ 3,541.66 |
| | | | | **Total Checks** | **$ 106,397.79** |
| | | | | **Total Bill Payments** | **$ 477,200.00** |
| | | | | **Total Amount Due** | **$ 583,597.79** |

EXHIBIT A